[No. B175005. Second Dist., Div. Two. Sept. 21, 2005.]

ROBERT BENNETT, JR., et al., Plaintiffs and Appellants, v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and
Respondent.

COUNSEL

Kiesel, Boucher & Larson, Raymond P. Boucher, Michael C. Eyerly; Arias, Ozzello & Gignac, Mike Arias, Mark A. Ozzello, Arnold C. Wang; Law Office of Daniel U. Smith, Daniel U. Smith and Ted W. Pelletier for Plaintiffs and Appellants.

Marlin & Saltzman, Louis M. Marlin and Stephen P. O'Dell for Defendant and Respondent.

OPINION

**BOREN, P. J.**—This appeal concerns the Willed Body Program (WBP) at University of California, Los Angeles (UCLA). Plaintiffs are relatives of body-donor decedents. The complaint alleges that UCLA mishandled the decedents' remains after scientific uses were concluded. In a prior appeal, we determined that plaintiffs had sufficiently alleged causes of action for negligence, fraud, and breach of contract. (*Bennett v. Regents of the University of California* (July 23, 2001, B135382) [nonpub. opn.].)

■ Plaintiffs are now appealing the trial court's denial of class certification, an order that we affirm here. Plaintiffs' common claims for their proposed class action are quite limited, and far narrower than those alleged in their complaints. Given the narrowing of the issues and the evidence presented, it is necessary to refine the scope of plaintiffs' viable claims. Specifically, we conclude that the factual basis for plaintiffs' class claim—multiple, simultaneous incineration of human remains—is not an actionable wrong in the context of a university's WBP. Moreover, despite nine years of litigation, plaintiffs failed to present any admissible evidence of their common "core fact" that the decedents' remains were improperly disposed of at a landfill.

## FACTS

### *Plaintiffs' Claims*

As described in our prior opinion, plaintiffs are close family members of decedents who agreed to donate their bodies "for teaching purposes [and] scientific research . . ." to the WBP at UCLA. Prospective donors were directed to disclose their bequest to their relatives. UCLA's written instructions advised the donors that their remains would be cremated and buried without record or scattered in a rose garden at a memorial park.

Plaintiffs believe that UCLA did not handle their relatives' remains in a dignified manner after medical study and research was concluded. Plaintiffs enumerated a number of offensive acts committed by the university while disposing of the bodies. These alleged acts included stuffing bodies full of medical waste such as needles, scalpels, gloves, etc; incinerating bodies *en masse* or failing to fully incinerate the bodies; mixing human remains with animal carcasses and dumping them all at a landfill like common refuse; and using mass graves for commingled ashes.

Plaintiffs moved for class certification based upon their sixth amended complaint. They seek recovery on various causes of action: negligence; breach of contract; breach of the implied covenant of good faith and fair dealing; and fraud. They have limited their claims to the close family members of donors whose remains were cremated on campus, then allegedly sent to an off-campus landfill. The proposed class members had to be aware of the donor's death and the arrangements the donor made with the WBP. The relevant timeframe is 1985 to 1993. Plaintiffs seek certification for liability purposes only: they concede that each member must independently prove his or her emotional distress damages.

Plaintiffs identified the "core" fact pattern for establishing liability for UCLA's alleged wrongdoing. The core facts are that (1) they are close family members of WBP donors; (2) when the donor died, plaintiffs notified the WBP of the death and surrendered the donor's remains unembalmed, unautopsied and intact; (3) after medical research was conducted, the donated bodies were wrapped in shrouds and placed into an incinerator several at a time; (4) the ashes were scraped into a bin and taken to a landfill; and (5) UCLA did not reveal during the class period that the cremains were being disposed of at a landfill.[1]

## Evidence Relating to the Core Class Claims

Plaintiffs and defendants both presented deposition testimony from WBP laboratory technician Bennie Dudley, a WBP employee from 1965 to 1993, who was in charge of handling the intake of WBP donor cadavers and their final disposition. Dudley stated that 90 to 95 percent of the donated bodies were used for gross anatomy teaching purposes, i.e., they were dissected. Whatever remained of the dissected bodies was gathered in "bundles," wrapped in shrouds and cremated several at a time.[2] Bodies that were intact (not dissected) were cremated individually. Sometimes, bodies donated to UCLA's WBP were redonated by the program to other medical schools, including the University of California at Irvine.

Dudley testified that the cremains were removed from the incinerator and placed in a large metal wheeled container. He did not know where the bins were taken once they were filled. Dudley's assistants confirmed that multiple "bundles" of dissected remains were cremated together and that the crematory was not emptied until it was full of ashes.

During his 28-year tenure at UCLA, Dudley did not recall seeing any improperly or partially cremated remains. At times, the ashes left in the crematory might include a small amount of medical waste such as glass vials or the occasional surgical instrument. The waste may have come from the pathology department, which shared the crematory with the WBP. During the relevant class period (1985–1993), the instruction sheet that Dudley sent to prospective donors stated that their remains would be "cremated and buried

---

[1] The word "cremains" is defined as "the ashes of a cremated person." (Oxford English Dict. Online (2005) <http://dictionary.oed.com/cgi/entry/00338466?single=1&query_type=word&queryword=cremains&first=1&max_to_show=10> [as of Sept. 21, 2005].)

[2] What remained of a cadaver following a dissection was, at times, a mere "shell" that weighed as little as five or six pounds, according to the testimony.

without record" unless the WBP was notified of any special burial or funeral arrangements.[3] The WBP returned the remains of donors to their families when private dispositions were requested. No family members ever complained about the manner in which bodies were handled.

Some of the WBP cremains were delivered to a boat for burial at sea. The boat captain discovered nonorganic medical waste including syringes, glass vials and gauze mixed with the cremains when one of the boxes from the WBP burst. This event, and the ensuing furor, was reported in local newspapers and on the television news in November 1993, February 1994, and November 1996.

The lead plaintiff, Robert Bennett, was not the person who notified the WBP of his mother's death. He did not expect his mother's cremains to be returned to him after her cadaver was studied by the WBP, though he was under the impression that they would be handled separately from other donors. Bennett first learned of the alleged mishandling of the cremains in 1996, when an attorney's investigator came to his home and showed him some information. Bennett did not recall what UCLA promised to do with his mother's cremains.

Potential class member Rita Harris did not contact the WBP to retrieve her mother's body. Harris never considered that her mother's body might be dismembered for study, when UCLA received it in 1983. Harris did not expect the body to be returned; rather, she expected the cremains to be scattered in a rose garden. Harris does not know the ultimate disposition of her mother's remains. At the time of her mother's death, WBP donor remains were being handled by the county, which maintained a cemetery plot in a rose garden. Harris's father informed her of the alleged mishandling, which, as Harris recalled, was detailed in a newspaper article within 10 years of her mother's death, i.e., by 1993.

Potential class member Albert Gladstone did not take any steps to have his mother's body delivered to the WBP in 1991 and he did not read any of the paperwork involved in the donation. He did, however, contact the WBP to pick up his father's body in 1994. Gladstone understood that his mother's body might be dissected, but he expected the components to be gathered up and cremated together, then scattered at sea. He claims to have learned of the alleged mishandling from his brother in 1996. His brother learned of the mishandling through media reports. Gladstone's former wife testified that she

---

[3] The promise of a rose garden apparently arose at some point after the close of the 1993 class period.

heard media reports about the WBP in 1993, and discussed them with Gladstone. Despite knowing of the growing scandal, according to his ex-wife, Gladstone nevertheless delivered his father's body to the WBP in 1994.

## THE TRIAL COURT'S RULING

The trial court found that plaintiffs have failed to demonstrate the existence of common issues of fact and law with respect to UCLA's liability to them. The court concluded that there was a lack of commonality sufficient to warrant class certification because of the need to individually prove issues relating to (1) emotional distress damages, (2) the statute of limitations, (3) the alleged unilateral contract, and (4) reliance on UCLA's alleged misrepresentations.

## DISCUSSION

1. *Appeal and Review*

■ The denial of class certification is an appealable order. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) Trial courts exercise "great discretion" in deciding whether to certify a class. (*Ibid.*; *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 655 [22 Cal.Rptr.2d 419].) That discretion will not be disturbed if the court's decision is supported by substantial evidence, unless the court used improper criteria or made erroneous legal assumptions. (*Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d at p. 470; *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1287 [119 Cal.Rptr.2d 190].)

■ The court considers "evidence bearing on the factual elements necessary to determine whether to certify the class." (*Caro v. Procter & Gamble Co., supra,* 18 Cal.App.4th at p. 656.) The plaintiff must establish the factual existence of a " 'community of interest' " among the prospective class members. (*Ibid.*; Code Civ. Proc., § 382.) "The 'community of interest' requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Sav-on Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 [17 Cal.Rptr.3d 906, 96 P.3d 194]; see *Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d at p. 470; *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1123 [245 Cal.Rptr. 658, 751 P.2d 923].)

■ Plaintiffs cite several cases for the proposition that appellate courts can "consider only the reasons given by the trial court for the denial [of class

certification], and ignore any other grounds that might support denial." (*Quacchia v. DaimlerChrysler Corp.* (2004) 122 Cal.App.4th 1442, 1447 [19 Cal.Rptr.3d 508]; see *Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 829 [97 Cal.Rptr.2d 226].) We see no reason to indulge in the fiction that a case should be allowed to proceed, needlessly consuming judicial resources and the parties' money, when legal impediments come to our attention. In an exceptional case, where the parties have had notice and an opportunity to brief the issue, class certification may be refused because a claim lacks merit as a matter of law. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 443 [97 Cal.Rptr.2d 179, 2 P.3d 27].)

This case has been pending for nine years. In 2001, we considered this case on demurrer. At that time, plaintiffs' claims were broad enough to survive demurrer. Now, their claims—at least as to those asserted as a class—have greatly narrowed. The narrowing of plaintiffs' claims, in combination with testimony regarding the nature of the WBP, leads us to the conclusion that this is the exceptional case that demands a renewed examination of whether the plaintiffs are pursuing an actionable wrong. It would be unjust to allow the parties to continue litigating this matter on a legal theory that cannot ultimately be sustained.

## 2. *Multiple Cremations Are Not an Actionable Wrong in This Case*

When we last reviewed this case, it was an appeal taken after demurrers were sustained. Witness testimony is now adding a different perspective to the case. As sometimes occurs, there is a gulf between the lurid allegations made in plaintiffs' complaints and the greatly diminished claims they are making here. Based on the bare allegations in the complaint, the concerns voiced in our prior opinion had to do with plaintiffs' claims of partial or inadequate cremation and mixing remains with animal carcasses and the like. Those concerns are not implicated here, because the class action plaintiffs have limited their claims of impropriety to (a) the claim that UCLA improperly cremated more than one cadaver (or portions thereof) at a time, and (b) the claim that UCLA improperly deposited the cremains in a landfill.

In the context of a university's WBP, we find, as a matter of law, that it is not improper for WBP remains to be cremated severally. According to the undisputed deposition testimony, 90 to 95 percent of the donors were subject to gross anatomical dissection, with different body parts being removed and taken to different departments as needed (e.g., dentistry, neurology or orthopedics). Without dwelling excessively on the details, it is difficult to imagine how a cadaver that has been segmented and reduced for anatomical study, organ-by-organ, muscle-by-muscle, bone-by-bone, can be reconstituted at the

completion of the study. Realistically, some parts (e.g., a brain that is being examined for the effects of Alzheimer's disease) would be studied far longer than other parts, or perhaps kept indefinitely.

It would be unduly burdensome to require a medical school to label and account for a willed-body donor's dissected tissue, organs, sinew and bones, and to ensure that all of the components are retrieved and cremated together, assuming that it is even possible to do so. The Legislature has recognized the impossibility of individual cremations for human remains that have been subjected to scientific study. It created an exemption from the usual rules requiring individual cremations by enacting Health and Safety Code section 7054.4: "Notwithstanding any other provision of law, recognizable anatomical parts, human tissues, anatomical human remains, or infectious waste following conclusion of scientific use shall be disposed of by interment, incineration, or any other method determined by the state department to protect the public health and safety."[4]

■ The first words of section 7054.4, "notwithstanding any other provision of law," remove willed body remains from the ambit of the statute requiring individual cremations. By authorizing the "incineration" of "human tissues" and "anatomical human remains" after "scientific use," the Legislature has underscored the distinction between a family-directed "cremation" and a medical school's permissible "incineration" of dissected remains. Nothing in section 7054.4 requires that the incineration of human tissue and remains be conducted individually.

■ Elsewhere in the Health and Safety Code, the Legislature has specified in the Medical Waste Management Act that education and research facilities produce "medical waste." (§ 117705, subd. (a) [former § 25024].)[5] The laboratories and educational facilities of the University of California are included among the entities that generate medical waste. (§ 117745 [former § 25026].) Facilities that generate medical waste—including recognizable human anatomical parts—may dispose of it by incineration. (§§ 118215, subd. (a), 118220 [former §§ 25090, 25090.5].) There is no requirement that separate waste containers be maintained for each individual's tissue or body parts. On the contrary, human remains may even be consolidated into a common container with nonorganic material such as needles prior to incineration. (§ 118275, subd. (h).)

---

[4] Unless otherwise indicated, all further statutory references in this opinion are to the Health and Safety Code.

[5] Medical waste includes biohazardous waste generated by research activities. (§ 117690 [former § 25023.2].) Biohazardous waste includes human tissue and blood. (§ 117635 [former § 25020.5].)

■ The provisions of the Medical Waste Management Act encompass the type of research and educational activities performed at the WBP. As a cadaver is gradually reduced for study over the course of weeks or months, the Medical Waste Management Act sensibly allows tissue and other no-longer-needed remains to be disposed of periodically, and exempts scientific facilities from any requirement that dissected tissue and recognizable human anatomical parts be kept together in separate containers. If the law allows remains to be commingled during study, then by logical extension, the law also allows commingling to sterilize the remains.

■ The exemption from individual cremations that applies to WBP programs does not apply to private cremations, where the decedent's remains have not been subject to study, and where the family reasonably expects that the cremains they receive will be those of their relative, not some stranger. Outside of a WBP or similar scientific use, the law requiring individual cremations, section 7054.7, must be enforced.[6]

UCLA made no promises to cremate bodies separately during the class period. Donors were told that their remains would be "buried without record." There was no promise to inter the cremains of each donor separately, and it would not be reasonable to imply such a promise, given the reality of medical research and study and the provisions of the Health and Safety Code. Because donors had no reasonable expectation of individual burial, it makes little difference if UCLA used a common crematory for multiple cremations, because the cremains were destined for a common burial.

### 3. *Failure of Proof as To the Core Fact of Disposition in a Landfill*

■ The hearing on class certification is not a final resolution of the merits of a claim. (*Bartold v. Glendale Federal Bank, supra,* 81 Cal.App.4th at p. 829.) "But when the merits of the claim are enmeshed with class action requirements, the trial court must consider evidence bearing on the factual elements necessary to determine whether to certify the class." (*Ibid.*) In the present case, plaintiffs have asserted that class certification is appropriate because all of the cremains of their relatives were improperly taken to a landfill. The question is whether there is any admissible evidence bearing on this alleged common factual element.

In their brief on appeal, plaintiffs cite to pages 1781 to 1860 of their appendix as evidence that the cremains were deposited in a landfill. The cited

---

[6] We express no opinion on the other allegations made in plaintiffs' complaints regarding partial cremation, inadequate cremation, and mixing human remains with animal carcasses. These are not part of plaintiffs' "core" fact pattern for purposes of certifying a class.

pages provide no proof at all that any cremains were taken to a landfill, let alone substantial evidence of this core fact. Elsewhere in the record, we were able to find some allusions to a landfill; however, the deponents who mentioned it were themselves relying on hearsay. For example, WBP employee Carmen Moore testified that someone named Mr. Osborne told him that the remains were taken to a landfill. This is unreliable hearsay, inasmuch as we do not know how Mr. Osborne obtained this information. In short, plaintiffs have failed to establish with any evidence the existence of one of the key common facts underlying their proposed class action.[7]

4. *Severing Liability from Emotional Distress*

█ Plaintiffs concede that emotional distress damages require a case-by-case trial for each member of the class. Emotional distress, in a lawsuit alleging improper treatment of human remains, can be difficult to prove. A class member cannot recover damages without "establish[ing] that he or she suffered severe emotional distress, and that the emotional distress was caused by a well-founded substantial certainty that his or her decedent's remains were among those reportedly mistreated . . . . A generalized concern that the remains of a relative may have been involved, arising out of a media report of a pattern of misconduct, is insufficient to satisfy the requirement that there be a direct connection between a defendant's conduct and the injury suffered by the plaintiff." (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 902 [2 Cal.Rptr.2d 79, 820 P.2d 181].)

█ As the trial court found, class certification is generally inappropriate when each member of the proposed class must individually establish emotional distress damages. There is no community of interest if class members are required to individually litigate numerous and substantial questions in order to establish their right to a recovery. (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913 [103 Cal.Rptr.2d 320, 15 P.3d 1071].)

This is a case where "the complexity of the damage question alone, fully litigated by each class member, would far outweigh any small benefit derived

---

[7] After oral argument, plaintiffs asked this court to augment the record with summary judgment documents submitted in a different case, *Gladstone v. Regents of the University of California* (Super. Ct. L.A. County, No. SC044755). We deny the motion to augment. It is well settled that a court cannot take judicial notice of the truth of matters stated in pleadings or affidavits in the court file of another case, although it can be noticed that the documents *exist*. Judicial notice can be taken only of the contents of orders, findings of fact, conclusions of law, and judgments. (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564 [8 Cal.Rptr.2d 552] [citing 11 cases for this proposition].)

from those issues which could be tried on a common basis." (*Brown v. Regents of University of California* (1984) 151 Cal.App.3d 982, 990 [198 Cal.Rptr. 916].) By contrast, cases that do not involve emotional distress damages may be appropriate for class action status. (See *Sav-on Drug Stores v. Superior Court, supra,* 34 Cal.4th 319 [class certification appropriate to determine recovery for employees' unpaid overtime compensation] and *Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263 [242 Cal.Rptr. 339] [class certification appropriate to determine recovery for unpaid welfare benefits owed to indigent residents].)

Here, each individual must prove—with psychological, medical, and personal testimony—severe emotional distress based on a well-founded substantial certainty that the remains of his or her relative were involved in the alleged misconduct, as required by *Christensen v. Superior Court, supra,* 54 Cal.3d 868. The trial court did not abuse its discretion by finding that the difficulty of establishing each individual's issues outweighs the benefit derived from jointly trying any common issues.

Given the present state of the evidence, after years of pretrial discovery, plaintiffs still have a long way to go to prove that their emotional distress is based on anything more than a generalized concern that the cremains of their relatives may have ended up in a public landfill.[8] The factual basis for a class action is inadequate for certification. And although class actions "can rarely be appropriate for resolution of mass tort claims," plaintiffs may be able to have the trial court coordinate their proceedings, thereby allowing the resolution of certain common facts while leaving each plaintiff responsible for proving facts particular to that individual. (*Jolly v. Eli Lilly, supra,* 44 Cal.3d at p. 1125, fn. 19; see Code Civ. Proc., § 404. See also *Christensen v. Superior Court, supra,* 54 Cal.3d at p. 876 [cremation case proceeding by coordination].)

## 5. *Remaining Contentions*

In light of our conclusion that plaintiffs have not established a case for class certification, we do not address the remaining arguments raised on appeal.

---

[8] Indeed, it appears that a substantial amount of the cremains never left the UCLA campus, if the university's counsel is correct.

## DISPOSITION

The judgment (order denying class certification) is affirmed.

Doi Todd, J., and Suzukawa, J.,* concurred.

A petition for a rehearing was denied November 1, 2005, and appellants' petition for review by the Supreme Court was denied January 4, 2006, S139106.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.