59 Cal.Rptr.3d 661 (2007)
151 Cal.App.4th 132
Evelyn CONROY, Plaintiff and Appellant,
v.
REGENTS OF the UNIVERSITY OF CALIFORNIA, Defendant and Respondent.
No. G035537.
Court of Appeal of California, Fourth District, Division Three.
May 23, 2007.
*663 Mahoney & Soil, Paul M. Mahoney and Richard A. Soll, Claremont, for Plaintiff and Appellant.
Marlin & Saltzman, Louis M. Marlin and Dale A. Anderson, Irvine, for Defendant and Respondent.

*662 OPINION
ARONSON, J.
This case arises from James Conroy's decision to donate his body to the medical school at the University of California, Irvine (UCI), upon his death in 1999. His wife, Evelyn Conroy, appeals the trial court's entry of judgment after (a) sustaining without leave to amend the demurrers of the Regents of the University of California (Regents) to her causes of action for breach of contract, breach of special duty, and intentional infliction of emotional distress; and (b) granting summary judgment on her claims of fraud, negligent *664 misrepresentation, and negligence. Conroy contends the Regents breached contractual and legal duties to her when UCI failed to keep track of her husband's body, failed to contact her before disposing of her husband's remains, and mishandled or otherwise treated her husband's body in a disrespectful manner while using it for purposes other than teaching or scientific research.
We conclude the trial court did not err. The only enforceable agreement at issue is the donation form Conroy's husband executed, which did not require UCI to track the body or notify relatives before disposing of the body. Moreover, Conroy failed to introduce any competent evidence UCI mishandled her husband's body or used it for purposes other than teaching or research. Accordingly, we affirm.

I

Factual and Procedural Background
In 1996, Conroy and her husband read a newspaper article about UCI's Willed Body Program (WBP), headlined: "UCI program in need of a few good bodies." Conroy telephoned Chris Brown, director of the program, asking about the program and what would happen to the donated bodies. According to Conroy, Brown made several promises in the course of their conversation. Brown assured her only UCI medical students would use the donated bodies for medical research at the university and promised UCI would advise her husband's physician of medical findings pertaining to her husband's body. He also promised that after use for research, UCI would cremate the donated bodies and notify the families so they could take part in a ceremony to scatter the ashes at sea.
In June 1996, Conroy's husband executed and returned to UCI a donation agreement, which provided: "I here state that it is my wish to donate my body to the Department of Anatomy and Neurobiology, College of Medicine, University of California, Irvine (UCI), immediately following my death, for teaching purposes, scientific research, or such purposes as the said University or its authorized representative shall in their sole discretion deem advisable. My body, when delivered to UCI, will be unembalmed and in good condition. It is further understood and agreed that final disposition of my body by UCI shall be in accordance with the State Code." In light of the donation, Brown provided Conroy a telephone number to call when her husband passed away, so UCI could pick up his body. He also sent her an instruction sheet requesting her not to have her husband's body embalmed or autopsied, and that she contact UCI to pick up the body within 48 hours of death.
On January 25,1999, James Conroy died at home at the age of 61. Conroy discovered his body and called the number Brown had given her. That evening, defendant Jeffrey Frazier and another man picked up the body, assuring Conroy they would treat it with respect. This was the last time Conroy saw her husband's body.
Eight months later, in September 1999, Conroy read a newspaper article reporting that bodies were "missing" from UCI's WBP. She made several calls to UCI over a month-long period before Dr. Peter Lawrence responded to her messages. Conroy claimed Lawrence, who took over the program after Brown had been terminated, admitted Brown had done a number of "disreputable things," including not keeping adequate records. Lawrence sent a letter to Conroy confirming her husband's body had been brought to the medical school, but UCI had no record of what happened to it.
Conroy sued the Regents, Brown, and Frazier, and alleged that donated bodies had been transported to locations other *665 than UCI, used for private tutoring to generate profits, and dismembered so that body parts could be sold. Conroy also alleged defendants failed to track the bodies and document their location to ensure proper identification and the return of remains to family members. Conroy alleged UCI knew of these problems before receiving her husband's body, but failed to disclose this information to her. Conroy filed a series of complaints, alleging causes of action for "(1) Breach of Implied Contract; (2) Negligence; (3) Negligent Misrepresentation; (4) Breach of Special Duty; (5) Intentional Infliction of Emotional distress; [and] (6) Fraud and Intentional Deceit." The trial court sustained demurrers to the first, fourth, and fifth causes of action without leave to amend.
The Regents moved for summary judgment on the second, third, and sixth causes of action. In opposing the motion, Conroy submitted evidence showing Brown owned or colluded in several companies that profited from questionable dealings involving WBP cadavers. Brown's partner in these transactions was Frazier, who had picked up James Conroy's body the night he died. One of the pair's companies, Replica, Inc., offered a gross anatomy class called "Medbound" to students interested in attending medical school. The class was held on UCI premises without authorization from UCI, using WBP cadavers. In July 1998, a UCI medical school professor, Dr. Robert Blanks, walked in on a Medbound class supervised by Brown. He also discovered photographs of WBP cadavers in Replica's storefront window, across the street from the medical school. Blanks reported his findings to Brown's supervisor, Dr. Richard Robertson. UCI ensured Replica removed the photographs from the storefront, but did nothing else. According to Conroy, these facts, together with another lawsuit filed in June 1998 involving the mishandling of WBP cadavers, put the Regents "on notice" of problems in the WBP which they should have corrected, but failed to do so.
Conroy also submitted evidence showing that in June 1999, Brown arranged for the removal of seven spines from WBP cadavers, which he and Frazier then sold, via another company, University Health Services, to a doctor conducting research at an Arizona hospital. Robertson learned of the sale and reported his discovery to the dean of the medical school, who ordered an internal investigation of the WBP. UCI auditors discovered that between January 1, 1995 and August 11, 1999, out of 441 bodies donated to UCI, there were no records to determine the final disposition of 320 of them by name. Finally, Conroy's declaration stated her husband relied on the oral promises Brown made before execution of the donation agreement.
The trial court granted the Regents' summary judgment motion, and entered judgment. Conroy now appeals.

II

Dismission

A. The Trial Court Did Not Err in Granting Summary Judgment

1. Negligence
Conroy argues the trial court erred in granting summary judgment in favor of the Regents on her claim UCI negligently mishandled her husband's remains. Conroy phrases the issue this way: "It is one thing to medically dissect human remains for research purposes. It is quite another to mishandle bodies, sell body parts to others, and conduct unauthorized classes with body parts." We conclude the trial court did not err because Conroy presented no evidence UCI mishandled James Conroy's body.
Specifically, Conroy sought to demonstrate UCI had a pattern and practice of *666 mishandling bodies in the WBP. She cited the unauthorized use of program cadavers in the Medbound class, Replica's photographic window display of UCI cadavers, Brown's clandestine reallocation of spines to an Arizona doctor in June 1999, the June 1998 lawsuit involving similar allegations of cadaver mishandling, and the refusal of mortuaries to cremate cadaver remains from UCI's WBP because they had not been properly tagged or identified. Based on this evidence, Conroy argues "the inference is that Mr. Conroy's body was mishandled."
The Supreme Court in Christensen v. Superior Court (1991) 54 Cal.3d 868, 2 Cal.Rptr.2d 79, 820 P.2d 181 ((Christensen), however, rejected an identical argument, ruling that "reports of a general pattern of misconduct are not sufficient, in and of themselves, to establish that defendants' misconduct included mishandling of the remains of each plaintiffs decedent." (Id. at p. 901, 2 Cal.Rptr.2d 79, 820 P.2d 181.) The court elaborated: "A generalized concern that the remains of a relative may have been involved, arising out of a media report of a pattern of misconduct, is insufficient to satisfy the requirement that there be a direct connection between a defendant's conduct and the injury suffered by the plaintiff. It does not supply a necessary elementthat the injury, here emotional distress, be caused by a breach of the defendant's duty to the particular plaintiff." (Id. at p. 902, 2 Cal.Rptr.2d 79, 820 P.2d 181.) To establish the necessary connection, the plaintiff must establish "the emotional distress was caused by a well-founded substantial certainty that his or her decedent's remains were among those reportedly mistreated...." (Ibid.) True, imposing the burden of proof of wrongdoing on the survivors may appear harsh where, as here, plaintiff claims the defendant "lost" her decedent's body, preventing direct evidence that it was mistreated. But, as the majority in Christensen explained, the rule follows from the plaintiffs general burden to show the defendant caused his or her injuries. (Id. at p. 900, 2 Cal.Rptr.2d 79, 820 P.2d 181.)
In dissent, Justice Kennard observed this burden "may preclude all recovery for many plaintiffs who would otherwise qualify. Plaintiffs will be forced to rely on defendants' records to determine which bodies were mishandled. If those records are inadequate (and it seems unlikely the crematory defendants kept records detailing their misdeeds), many plaintiffs will never be able to determine whether the remains of their decedents were mistreated." (Christensen, supra, 54 Cal.3d at p. 919, 2 Cal.Rptr.2d 79, 820 P.2d 181 (dis. opn. of Kennard, J.).) To address this problem, Justice Kennard proposed an alternate procedure "that when a plaintiff establishes tortious conduct by a defendant under circumstances making it virtually impossible for the plaintiff to prove causation, the burden shifts to the defendant to establish a lack of causation. [Citation.]" (Id. at pp. 919-920, 2 Cal.Rptr.2d 79, 820 P.2d 181 (dis. opn. of Kennard, J.).) But the majority rejected that proposal, concluding: "[W]ere we to accept the suggestions of Justice Kennard ..., a plaintiff could recover damages for emotional distress based on nothing more than a media report of misconduct that may have involved the plaintiffs loved one." (Id. at p. 902, 2 Cal.Rptr.2d 79, 820 P.2d 181, italics added.)
Here, Conroy provided no evidence UCI subjected her husband's body to any of the mistreatment she claimed constituted a pattern of misconduct. Indeed, her evidence demonstrated the opposite. Because James Conroy did not pass away until January 1999, his body could not have been involved in the 1998 Medbound class, nor could it have been one of the bodies in the photographs taken down *667 from Replica's storefront in July 1998. Similarly, the unspecified misconduct alleged in the June 1988 lawsuit necessarily predated its filing and therefore could not have involved James Conroy's body. Conroy's only specific allegation of mistreatment occurring when UCI had possession of her husband's body was the claim that in June 1999 Brown harvested seven spines from WBP cadavers for a doctor in Arizona. Nonetheless, she did not dispute the Regents' evidence that the spines were "fresh tissue specimens from bodies that would have entered the [WBP] within a few weeks of the Arizona trip," and hence none of the spines could have been from her husband because he died months earlier in January.
The only evidence Conroy submitted directly relating to her husband's body was that UCI could not account for the body's specific use and the final disposition. Conroy contends UCI's failure to keep track of her husband's body constituted mishandling entitling her to recover for emotional distress. We disagree.
Citing Christensen, Conroy argues UCI owed her the same duties as a mortuary or crematory. In Christensen, the court concluded that mortuaries and crematoria operators owe a special duty of care "to perform th[eir] services in the dignified and respectful manner the bereaved expect...." (Id. at p. 891, 2 Cal.Rptr.2d 79, 820 P.2d 181.) Christensen recognized that emotional distress damages for negligence are ordinarily limited to those who witness the negligent act, but expanded the scope of duty in that case to include close family members of the deceased even though they did not witness the defendants' mishandling of the body.
The expanded scope of duty in Christensen, however, arose not simply because the defendants handled dead bodies, but because "the defendants have undertaken to provide a service, the very purpose of which is to alleviate existing and avoid future emotional distress arising from the death.... The potential plaintiffs are limited to those for whom defendants performed a service." (Christensen, supra, 54 Cal.3d at pp. 899-900, 2 Cal.Rptr.2d 79, 820 P.2d 181, italics added.) Here, UCI undertook to perform no service for Conroy or other family members of the deceased. True, the WBP, like a mortuary or crematory, disposes of human remains. But the disposal of human remains is merely a necessary incident to the WBP's primary mission. As we recognized in Melican v. Regents (May 23, 2007, G036583) ___ Cal.App.4th ___, ___ [p.11], 59 Cal.Rptr.3d 672, 683-684, 2007 WL 1502155: "UCI does not purport to provide funeral-related services, and is not licensed to do 
so. `[F]uneral-related services are principally for the comfort of the living, having as their aim the consolation of the leading mourners. The expectations of the survivors, and "essence of the contract [for such services is] a reasonable expectation of dignity, tranquility, and personal consolation." [Citation.]' [Citation.] In contrast, the mission of UCI's WBP is to obtain cadavers for study and dissection by medical students. In recognition of this distinction, the Legislature specifically exempted public institutions, hospitals, and medical schools from the Funeral Directors and Embalmers Law. [Citation.]"
UCI's duties to Conroy are spelled out in the donation agreement, to wit, that UCI will use her husband's body "for teaching purposes, scientific research, or such purposes as the said University or its authorized representative shall in their sole discretion deem advisable," and to dispose of the remains "in accordance with the State Code." The donation agreement included no express promise UCI would track the body or provide Conroy a description of how UCI utilized the body. Nor do the circumstances suggest an implied *668 promise to do so, given the nature of study and scientific research involving cadavers. This point was recognized in Bennett v. Regents of University of California (2005) 133 Cal.App.4th 347, 355-556, 34 Cal.Rptr.3d 579 (Bennett), which held that another university's willed body program did not have a duty to track body parts, reassemble disarticulated parts, or cremate the cadaver as a whole. The court explained: "[I]t is difficult to imagine how a cadaver that has been segmented and reduced for anatomical study, organ-by-organ, muscle-by-muscle, bone-by-bone, can be reconstituted at the completion of the study.... [¶] It would be unduly burdensome to require a medical school to label and account for a willed-body donor's dissected tissue, organs, sinew and bones, and to ensure that all of the components are retrieved and cremated together, assuming that it is even possible to do so." (Id. at p. 355-356, 34 Cal.Rptr.3d 579.)
Simply put, during the relevant time period, UCI had no legal duty to track bodies donated under the WBP for the benefit of a donor's family where the donation agreement did not require UCI to return the remains.[1] Although mortuaries might have been concerned about accepting untagged bodies from UCI due to a statute requiring them to perform individual cremations (§ 7054.7), that provision does not apply to willed body programs. (See Bennett, supra, 133 Cal.App.4th at p. 357, 34 Cal.Rptr.3d 579 (Bennett).)
We conclude Conroy presented no evidence in opposing summary judgment that UCI mistreated her husband's remains. The purpose of summary judgment law "is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 844, 107 Cal.Rptr.2d 841, 24 P.3d 493.) Because there is no factual dispute for a jury to resolve concerning whether James Conroy's body was mistreated, the Regents were entitled to judgment on the issue as a matter of law. (Id, at p. 843, 107 Cal. Rptr.2d 841, 24 P.3d 493.)
Conroy's reliance on Saari v. Jongordon Corp. (1992) 5 Cal.App.4th 797, 7 Cal. Rptr.2d 82 (Saari) is misplaced. There, the defendant had contracted to cremate the decedent's body and release his ashes to his partner without performing any religious service. (Id. at p. 801, 7 Cal.Rptr.2d 82.) Instead of complying with the agreement, the defendant scattered the ashes at sea and performed a Christian burial service over them. (Ibid.) The decedent's mother, sister, and partner sued the defendant for failing to perform the services as arranged. The mother asserted her emotional distress arose in part when she lay awake at night, "wondering what had happened to her son's remains." (Id. at p. 806, 7 Cal.Rptr.2d 82.)
Relying on Christensen, the defendant in Saari argued the mother's uncertainty about the disposition of her son's remains could not form the basis of a recovery for emotional distress. (Saari, supra, 5 Cal. App.4th at p. 806, 7 Cal.Rptr.2d 82.) The appellate court disagreed, explaining: *669 "Saari's claim is not that she does not know if Robert's remains were mishandled, but that she is not certain what actual disposition was made of his ashes. As Saari's uncertainty does not raise any doubt about whether there was a breach of duty, Christensen does not preclude this basis of recovery for emotional distress." (Ibid.) Unlike Saari, there was no evidence UCI breached any contractual or legal duty concerning the disposition of the body of Conroy's husband. Accordingly, the trial court did not err in adjudicating Conroy's negligence claim in the Regents' favor.

2. Fraud and Intentional Deceit
Conroy contends "ample evidence" suggested UCI's agent, Chris Brown, intentionally misrepresented he would contact her to participate in a ceremonial scattering of her husband's ashes at sea. Conroy claimed Brown "knew that he was not keeping track of bodies coming into the WBP, and therefore he knew that he would not be able to notify [her] when the body was later cremated."
No matter how misleading or contemptible Brown's misrepresentations may have been, Conroy cannot demonstrate fraud absent evidence of actual reliance; otherwise, her fraud claim fails. (See City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith Inc. (1998) 68 Cal.App.4th 445, 482, 80 Cal.Rptr.2d 329 [it is "essential ... that the person complaining of fraud actually have relied on the alleged fraud"].) "Actual reliance occurs when a misrepresentation is `"an immediate cause of [a plaintiffs] conduct, which alters his legal relations,"' and when, absent such representation, `"he would not, in all reasonable probability, have entered into the contract or other transaction."' [Citations.] `It is not ... necessary that [a plaintiffs] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct.... It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision.' [Citation.]" (Engalla v. Permanente Medical Group, Inc. (1997) 15 Cal.4th 951, 976-977, 64 Cal.Rptr.2d 843, 938 P.2d 903.)
Conroy argues she established reliance in her declaration, which states in pertinent part: "In reliance on Chris Brown's statements to me, my husband and I agreed to donate our bodies to UCI and to participate in the Willed Body Program." The trial court, however, sustained the Regents' objection to this statement on the ground of speculation, and accordingly struck the phrase "my husband." Conroy does not challenge the court's evidentiary ruling on appeal. Consequently, this evidence demonstrates only that Conroy relied on Brown's statements. Conroy, however, did not execute her husband's donation agreement, or make any decision regarding disposition of his body.
Indeed, Conroy had no legal right to control the disposition of her husband's body. Section 7100 vests the right to control the disposition of the decedent's remains in various persons, including a surviving spouse, "unless other directions have been given by the decedent pursuant to Section 7100.1." Section 7100.1 provides "[a] decedent, prior to death, may direct, in writing, the disposition of his or her remains and specify funeral goods and services to be provided." These instructions may not be altered except by a writing signed and dated by the decedent. (Ibid.) Section 7150.5, subdivision (h), provides: "An anatomical gift that is not revoked by the donor before death is irrevocable and does not require the consent or concurrence of any person after the donor's death."
Thus, Conroy's personal reliance on Brown's statements is irrelevant to whether *670 UCI fraudulently induced her husband into donating his body. With no evidence Conroy's husband relied on Brown's statements, the trial court properly adjudicated Conroy's fraud cause of action in favor of the Regents.

3. Negligent Misrepresentation
Conroy also contends she established a triable issue of fact on whether UCI negligently misrepresented, as she put it in her complaint, that her husband's body "would be used for teaching purposes and for scientific research, and not utilized for gain or profit; and that at all times the decedent's body would be handled in a proper, respectful, and dignified manner." Conroy argues UCI's representations to this effect, "through their advertisements, literature, and the oral representations of their agents, employees, and representatives," were negligent because UCI should have known Brown "was selling body parts for profit and using bodies in unauthorized for profit classes that he taught."
As with fraud, negligent misrepresentation requires actual reliance. (Mirkin v. Wasserman (1993) 5 Cal.4th 1082, 1088-1089, 23 Cal.Rptr.2d 101, 858 P.2d 568.) As discussed, Conroy undertook no legally cognizable reliance because she did not act to her detriment by entering into any contract or transaction with UCI concerning her husband's body. The trial court therefore did not err in adjudicating Conroy's negligent misrepresentation claim in the Regents' favor.

B. The Trial Court Properly Sustained Demurrers to Conroy's Causes of Action for Breach of Implied Contract* Breach of Special Duty, and Intentional Infliction of Emotional Distress

1. Implied Contract
The first cause of action in Conroy's original complaint alleged she and UCI impliedly agreed that the medical school would (1) use her husband's body only for teaching and research purposes; (2) treat the body with respect; and (3) keep records necessary to track her husband's remains so the school could return his remains to her.
An implied contract "consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words." (Silva v. Providence Hospital of Oakland (1939) 14 Cal.2d 762, 773, 97 P.2d 798; Civ.Code, § 1621.) Unlike an express contract where the parties state their agreement orally or in writing (Civ.Code, § 1620), the existence and terms of an implied contract are "manifested in conduct" (§ 1621). Conroy contends a contract was formed when she complied with the instruction sheet UCI provides survivors, which requests they promptly telephone UCI when the donor dies, and refrain from permitting an autopsy or embalming of the body.
It is axiomatic that consideration must support every contract. (Civ.Code, § 1550, subd. (4).) In Asmus v. Pacific Bell (2000) 23 Cal.4th 1, 10, 96 Cal.Rptr.2d 179, 999 P.2d 71, cited by Conroy, the Supreme Court explained: "In a unilateral contract, there is only one promisor who is under an enforceable legal duty. [Citation.] The promise is given in consideration of the promisee's act or forbearance. As to the promisee, in general, any act or forbearance ... may constitute consideration for the promise." Conroy asserts she supplied the requisite consideration to form a separate agreement with UCI by forbearing from delay in contacting UCI upon her husband's death and by refraining from embalming the body or permitting an autopsy. We disagree.
As we discussed above, section 7100.1 provides that a decedent's written instructions *671 on the disposition of his or her remains overrides a surviving spouse's right to dispose of the body. The decedent's instructions under this provision "shall be faithfully carried out upon his or her death...." (§7100.1, subdivision (a).) The Legislature has directed that the statutory framework concerning the disposition of remains must "be administered and construed to the end that the expressed instructions of the decedent or the person entitled to control the disposition shall be faithfully and promptly performed." (§ 7100, subd. (e), italics added.) A donor's anatomical gift "does not require the consent or concurrence of any person after the donor's death." (§ 7150.5, subd. (h).)
Thus, Conroy could not legally dispose of her husband's remains in any manner other than that prescribed by UCI. "Consideration may be forbearance to sue on a claim, extension of time, or any other giving up of a legal right, in consideration of some promise." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 211, p. 246, italics added.) But where a duty is imposed by law, "the promise to perform it is obviously not good consideration." (Id., § 219, p. 253.) Accordingly, Conroy's acts and forebearance in following UCI's instruction sheet failed to constitute lawful consideration for an implied contract. The trial court did not err in sustaining demurrers to Conroy's breach of contract claim.

2. Breach of Special Duty
Conroy's cause of action for breach of special duty alleged that when UCI retrieved James Conroy's body from her home, it undertook a special duty of care to treat her spouse's body respectfully and thereby protect her sensibilities as a survivor. Conroy asserts this duty is "analogous" to the special duty that mortuaries and crematories assume to close relatives of decedents for whose benefit they provide funeral and related services. Specifically, Conroy relies on Christensen, supra, 54 Cal.3d at p. 891, 2 Cal.Rptr.2d 79, 820 P.2d 181 for the principle that the special relationship undertaken by mortuary and crematory operators with the decedent's loved ones "obligat[es] them to perform th[eir] services in the dignified and respectful manner the bereaved expect...."
This cause of action is redundant in light of Conroy's negligence cause of action, in which she alleged "[defendants had a further duty to see to it that the body of plaintiffs husband ... was handled in an individual, proper, dignified, respectful and lawful manner." Because Conroy's negligence cause of action survived the pleading stage, she suffered no prejudice when the trial court eliminated her redundant breach of special duty claim.

3. Intentional Infliction of Emotional Distress
The elements of intentional infliction of emotional distress are: "`(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiffs suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. [Citations.] ... [Citations.] Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community. [Citations.]'" (Davidson v. City of Westminster (1982) 32 Cal.3d 197, 209, 185 Cal.Rptr. 252, 649 P.2d 894.) The defendant must have engaged in "conduct intended to inflict injury or engaged in with the realization that injury will result." (Id. at p. 210, 185 Cal.Rptr. 252, 649 P.2d 894.)
Nonetheless, "[i]t is not enough that the conduct be intentional and outrageous. It must be conduct directed at the *672 plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." (Christensen, supra, 54 Cal.3d at p. 903, 2 Cal.Rptr.2d 79, 820 P.2d 181.) In Christensen, the defendants, mortuary and crematory operators, were alleged to have desecrated the remains of plaintiffs' loved ones, removed valuables from the decedents, commingled the decedents' ashes with other remains, and, without authorization, sold body parts and organs to a biological supply company. Despite these allegations, the Supreme Court nonetheless held the plaintiffs failed to state a cause of action because "[p]laintiffs here have not alleged that the conduct of any of the defendants was directed primarily at them, [or] was calculated to cause them severe emotional distress...." (Id. at p. 906, 2 Cal.Rptr.2d 79, 820 P.2d 181.) In addition, the court noted that none of the acts of desecration, commingling, and theft were alleged to have been performed in the plaintiffs' presence. (Ibid.)
As in Christensen, Conroy has not alleged defendants directed their allegedly outrageous actions primarily at her, or that they performed the alleged acts of mishandling and desecration of her husband's body in her presence. Accordingly, the trial court did not err in sustaining demurrers to Conroy's cause of action for intentional infliction of emotional distress.

III

DISPOSITION
The judgment is affirmed. In the interests of justice, each party shall bear its own costs for this appeal.
RYLAARSDAM, Acting P.J., and FYBEL, J., concur.
NOTES
[1] Added by the Legislature during the 2000 session, subdivision (d) of Health and Safety Code section 7154 provides: "For all donations made pursuant to an [sic ] document of gift executed after January 1, 2001, following the final disposition of the remains of the donor, upon request of a person specified in Section 7100, the donee shall return the cremated remains of the donor at no cost to the person specified in Section 7100, unless the donor has previously designated otherwise in the document of gift. A person who knowingly returns the cremated remains of a person other than the donor to a person specified in Section 7100 shall be punished by imprisonment in the county jail for not more than one year."