Filed 1/30/23 Shankar v. Medpoint Management CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ARVIND SHANKAR, | B309862 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. 18STCV00530) |
| MEDPOINT MANAGEMENT, INC., | |
| Defendant and Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Maren Nelson, Judge. Affirmed in part and reversed in part.

Robert C. Moest for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Ernest Slome and Joseph C. Campo for Defendant and Respondent.

—————————————

# INTRODUCTION

Plaintiff and appellant Arvind Shankar[1] alleges he has a persistent throat infection that requires specialized treatment, but that he has been denied such treatment. To address this alleged wrong, he sued among others a healthcare management company named Medpoint Management, Inc. (Medpoint) that allegedly provided utilization review services to his insurer on claims for negligence, intentional infliction of emotional distress (IIED), breach of contract, and violation of the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.).[2] Shankar brought these claims not only on his own behalf, but also on behalf of a proposed class of patients referred to a medical specialist for services who were unable to timely obtain such services. The trial court granted Medpoint's demurrer to the causes of action for breach of contract and violation of the UCL. It overruled the demurrer as to the negligence and IIED claims, but sustained it as to any class action allegations on those two claims.

Shankar now appeals that ruling. We conclude that Shankar's breach of contract claim, which is premised on a third party beneficiary theory, and his UCL claim both fail to state viable claims and that the court did not err in sustaining the demurrer to both claims without leave to amend. As for the class action allegations, we affirm the trial court's order sustaining the demurrer to class treatment of the negligence and IIED causes of

---

[1] Shankar initiated his lawsuit under the fictitious name "James Poe," but the trial court ordered him to reveal his identity and use his real name.

[2] Unspecified statutory references are to the Business and Professions Code, unless otherwise indicated.

action because Shankar fails to show a community of interest among class members with respect to those claims, and there is no reasonable possibility that Shankar can amend his allegations to cure this defect.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Shankar's Allegations

Shankar alleges in the operative second amended complaint (SAC) that since 2016 he has had a throat infection that causes a burning sensation, irritation, increased mucus production, and pain and soreness in the tissues adjacent to the infection site. Initially, Shankar's symptoms were mild. In August 2017, they rapidly became more severe, including greatly increased production of mucus and phlegm, pain in numerous joints, neck stiffness, and burning and pressure sensations in various parts of his body. Shankar went to the emergency department of an unidentified hospital three times that month. He was prescribed two courses of antibiotics, which both had temporary positive results, but his symptoms soon returned to their prior severity. Shankar attempted to arrange an evaluation by a primary care provider to obtain a referral to an infectious disease specialist but was unable to do so.

Shankar therefore decided to enroll in a different health plan. On or about September 12, 2017, Shankar became a member of a health plan offered by defendant Local Initiative Health Authority for Los Angeles County doing business as L.A. Care Health Plan (L.A. Care). On or about September 13, 2017, Shankar chose to be assigned to Pioneer Medical Group (Pioneer). Medpoint "provide[s] management services to [Pioneer] and other medical groups in the Los Angeles area, which include [u]tilization [r]eview services." Shankar saw physicians at

3

Pioneer on September 14 and 26, 2017. The physician who examined Shankar on September 26 concluded that he should be seen by an infectious disease specialist "and also should be examined at a specialty clinic within [Pioneer]."

A few days later, Pioneer informed Shankar that the referral to the infectious disease specialist had been approved by utilization review. However, despite the referral being approved, Shankar has been unable to obtain an evaluation by an infectious disease specialist. Shankar alleges that Medpoint failed to arrange for an infectious disease specialist to examine him despite his multiple requests. Shankar "has received no treatment, and has thereby suffered loss of sleep, significant harm to his health, significant pain and suffering, and impairment in his daily activities."

L.A. Care and one of its employees were named defendants in the initial complaint. Those parties settled with Shankar, are no longer defendants, and are not involved in this appeal. Medpoint's chief executive officer was named as a defendant in earlier versions of the complaint, but not in the SAC, and she is not involved in this appeal. Pioneer is not a named defendant in this case; it is, however, a defendant in a related case filed by Shankar involving similar allegations that he was improperly denied treatment for his throat infection (*Henry Poe v. Pioneer Medical Group, Inc.* (Super. Ct. L.A. County, 2018, No. BC721826)).[3] Thus, the only remaining defendant in this case is Medpoint.

_____

[3] We take judicial notice of the existence of this complaint, which is part of the record because the trial court took judicial notice of the complaint in ruling on the demurrer to the SAC.

**B.     Shankar's Causes of Action**

The SAC asserts four causes of action against Medpoint: negligence, IIED, breach of contract, and violation of the UCL. There are also class allegations seeking relief for putative class members who have been injured by Medpoint's alleged conduct.

Shankar alleges that Medpoint was negligent "by failing to take reasonable steps to provide for access to specialist care within the time interval prescribed by" California Code of Regulations, title 28, section 1300.67.2.2, subdivision (c)(5)(B) (section 1300.67.2.2(c)(5)(B)). According to Shankar, this regulation required that Shankar "must have an opportunity to see the specialty physician within 96 hours of [when his primary care physician] determines that specialty care is necessary." The full text of the regulation provides that "each [health care service] plan shall ensure that its network has adequate capacity and availability of licensed health care providers to offer enrollees appointments" for "[u]rgent care appointments for services that require prior authorization . . . within 96 hours of the request for appointment," provided, however, that "[t]he applicable waiting time for a particular appointment may be extended if the referring or treating licensed health care provider, or the health professional providing triage or screening services, as applicable, acting within the scope of his or her practice and consistent with professionally recognized standards of practice, has determined and noted in the relevant record that a longer waiting time will not have a detrimental impact on the health of the enrollee." (Cal. Code Regs., tit. 28, § 1300.67.2.2, subds. (c)(5)(B), (G).)

Shankar's IIED cause of action is premised on the allegation that Medpoint "ignored, disregarded, gave false responses to, or otherwise obstructed numerous efforts by

5

[Shankar], or efforts made by others on behalf of [Shankar], through which [Shankar] was attempting to obtain a consultation from a competent [i]nfectious [d]isease specialist."

In his breach of contract cause of action, Shankar alleges based on information and belief that Medpoint has written contracts with L.A. Care and Pioneer. Shankar acknowledges that he has never seen these contracts but alleges he "is informed and believes that the legal effect of the aforesaid written contracts is to impose an obligation upon [Medpoint] to promptly review referrals for specialty medical services made by primary care physicians, to determine whether those referrals are appropriate and reasonably medically necessary, and to promptly arrange for appropriate specialists to render those specialty medical consultations. Among the obligations of [Medpoint] in the aforesaid contracts is to comply with all applicable regulations promulgated by the State of California, and also to comply with the standards of practice prevailing in the medical profession." Shankar alleges he "is also informed and believes that the legal effect of the aforesaid written contracts is to make [Shankar] and others similarly situated to be explicitly intended third party beneficiaries of the aforesaid written contracts."

As for the UCL, Shankar alleges Medpoint's violation of section 1300.67.2.2(c)(5)(B) constitutes both an "unlawful" and an "unfair" business practice. Shankar does not allege he has yet suffered any monetary injury, instead asserting he "is being forced to imminently use his own financial resources to pay for a specialty consultation and to pay for the medication that is likely to be necessary." Shankar seeks injunctive relief, restitution and attorney fees on the UCL cause of action.

In addition to his individual claims, Shankar seeks to assert all of his causes of action against Medpoint on behalf of a "class of persons seeking damages from [Medpoint]" defined as "all patients who obtained medical services at any medical practice or medical group for which these defendants provided management services, and who were referred to obtain medical services from a specialist physician, and who were unable to obtain specialty medical services in compliance with the specific deadlines imposed by the California Code of Regulations. The class will be limited to those patients who suffered harm from any of these types of tortious conduct within a period of five years prior to the filing of the [c]omplaint in this action, and it will include patients who have suffered such harm after the [c]omplaint was filed."

## C.    The Court's Ruling on Medpoint's Demurrer

Medpoint filed a demurrer to the SAC. After briefing and argument, the trial court issued a written ruling sustaining the demurrer as to the breach of contract and UCL causes of action. With regard to the breach of contract claim, the court concluded Shankar "failed to plead the specific contract provisions he contends were breached and further, failed to allege facts showing he is an intended third party beneficiary of any Med[p]oint contract" and denied leave to amend. As to the UCL cause of action, the court concluded Shankar failed to allege Medpoint engaged in "unlawful" business practices by not arranging an appointment with an infectious disease specialist within the time period allegedly required by section 1300.67.2.2(c)(5)(B) because that regulation applies only to "health care service plans" (HCSP) and Shankar did not allege that Medpoint was an HCSP. It further concluded that Shankar

7

had failed to adequately allege that Medpoint engaged in "unfair" business practices because he did not sufficiently identify what conduct by Medpoint was "unfair" and instead alleged "unfair" conduct by incorporating all prior allegations. Finally, noting that UCL remedies are limited to injunctive relief and restitution, the court held the SAC improperly sought attorney's fees. The court granted Shankar leave to amend his UCL cause of action to allege that Medpoint is an HCSP, but Shankar elected not to do so.

The court overruled the demurrer as to the negligence and IIED causes of action, but sustained it with leave to amend with respect to the class action allegations related to those two claims.[4] With respect to those class action allegations, the court concluded that individual issues would predominate over common issues as the inquiry into whether class members were harmed would necessarily be individualized and might in some cases require expert testimony.

On December 22, 2020, Shankar filed a timely notice of appeal of the trial court's ruling on Medpoint's demurrer to the SAC.

## DISCUSSION

Shankar contends that each component of the trial court's ruling sustaining the demurrer was error. After discussing the appealability of the trial court's order and the standard of review, we examine the court's ruling on each of the SAC's claims. We

---

[4] The court did not address the demurrer to the class action allegations on the breach of contract or UCL claims, finding it moot in light of its ruling on the underlying claims.

begin with the breach of contract and UCL claims before turning to the class action allegations.[5]

## A. Appealability of the Trial Court's Order Granting Medpoint's Demurrer

Shankar appeals the trial court's order sustaining Medpoint's demurrer, which did not entirely dispose of all claims in the case. Although normally an order granting a demurrer is not appealable, the parties agree, as do we, that Shankar's appeal is proper under the death knell doctrine given that the demurrer ruling disposed of all Shankar's class claims.

---

[5] In the reply brief, at pages 36 through 45, Shankar's counsel engages in a rambling discussion of the United States Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* (June 6, 2022, No. 19-1392) ___ U.S. ___ [142 S.Ct. 2228, 213 L.Ed.2d 545], and several matters involving judges and prosecutors from across the country, all of which he claims have undermined the public's confidence in the judiciary and "demonstrate a general breakdown in the foundations of American society." Neither the *Dobbs* decision, nor any of the other matters referenced in this discussion has any connection to this case, and we fail to perceive how any of this discussion is relevant to any proper argument in this appeal. In addition, in his supplemental brief on the issue of standing under the UCL (at pages eight through 10), Shankar's counsel again engages in an irrelevant and improper discussion regarding the judiciary and law enforcement prosecutorial priorities. Accordingly, we do not consider the material on pages 36 through 45 of Shankar's reply brief, and on pages eight through 10 of his supplemental brief. (See *Matuz v. Gerardin Corp.* (1989) 207 Cal.App.3d 203, 207 [court disregards irrelevant matters discussed in an appellate brief; "irrelevant matters in a brief have no persuasive weight in determining an appeal"].)

A recent case succinctly explained the death knell doctrine: " 'Under the one final judgment rule, " 'an appeal may be taken only from the final judgment in an entire action.' " [Citations.] " 'The theory [behind the rule] is that piecemeal disposition and multiple appeals in a single action would be oppressive and costly, and that a review of intermediate rulings should await the final disposition of the case.' " ' [Citation]  An exception to the rule, however, exists for the denial of class certification.  Known as the 'death knell doctrine,' the rule is a ' " 'tightly defined and narrow' " exception to the one-final-judgment rule . . . .' [Citation]  [¶] 'Under this exception, an order is appealable when "it effectively terminates the entire action as to [a] class, in legal effect being 'tantamount to a dismissal of the action as to all members of the class other than plaintiff.' " [Citations.]  Thus, an order determining that a plaintiff cannot "maintain his [or her] claims as a class action but [can] seek individual relief" is immediately appealable. . . .' [Citation.]" (*Allen v. San Diego Convention Center Corp., Inc.* (2022) 86 Cal.App.5th 589, 595.) "[A]n order sustaining a demurrer to class allegations will generally qualify as a death knell order, *regardless of whether leave to amend is granted to reallege class claims*, because the order in effect strikes the allegations from the complaint." (*Williams v. Impax Laboratories, Inc.* (2019) 41 Cal.App.5th 1060, 1064, 1070-1071.)

## B.    Standard of Review

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.]  We also consider matters which may be judicially

10

noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "We will affirm if the trial court's decision was correct on any theory. [Citation.]" (*Gutierrez v. California Commerce Club, Inc.* (2010) 187 Cal.App.4th 969, 976.)

## C. Shankar Fails to Plead a Viable Cause of Action for Breach of Contract under the Third Party Beneficiary Doctrine

To allege a cause of action for breach of a written contract, "the plaintiff must plead the existence of a contract, its terms which establish the obligation in issue, the occurrence of any conditions precedent to enforcement of the obligation, and the breach of that obligation." (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 383.) Further, "it is absolutely essential to plead the terms of the contract either in *haec verba* or according to legal effect." (*Twaite v. Allstate Ins. Co.* (1989) 216 Cal.App.3d 239, 252.) Lastly, when seeking to assert a third party beneficiary theory, as Shankar does here, a plaintiff also must allege facts indicating why he or she is a third party beneficiary of the contract at issue. (*Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 826-837 (*Goonewardene*).)

11

In *Goonewardene,* our Supreme Court affirmed the sustaining of a demurrer to a third party beneficiary breach of contract claim. The court began by noting that "an individual or entity that is not a party to a contract . . . may bring a breach of contract action against a party to a contract only if the third party establishes not only (1) that it is likely to benefit from the contract, but also (2) that a motivating purpose of the contracting parties is to provide a benefit to the third party, and further (3) that permitting the third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties." (*Goonewardene, supra*, 6 Cal.5th at p. 821.)

*Goonewardene* involved a wage claim in which the plaintiff employee asserted she was a third party beneficiary of a contract between her employer and a payroll company. In seeking to sue the payroll company for breach of contract, the complaint alleged "on information and belief" that the employer and the payroll company had entered into a contract (the specific terms of which were unknown to the employee) under which the payroll company agreed to perform the employer's payroll tasks for the benefit of both the employer and its employees. (*Goonewardene, supra*, 6 Cal.5th at p. 832.) Those payroll tasks allegedly included maintaining employee earnings records, adding hours on their time cards, calculating wages under the applicable labor laws, and preparing the paychecks and pay stubs for the employees. (*Id*. at p. 826.) The complaint alleged the payroll company failed to comply with its contractual obligations by negligently failing to provide plaintiff with paychecks and pay stubs that accurately reflected the wages she was due under the applicable labor statutes and wage orders. (*Ibid*.)

12

Analyzing the three prongs it found were required to establish a third party beneficiary, the *Goonewardene* court held these allegations insufficient to state a claim. As to the first prong that the third party is likely to benefit from the contract, the court assumed without deciding that the hiring of a payroll company would generally benefit employees with regard to the wages they receive. (*Goonewardene, supra,* 6 Cal.5th at p. 835.) We likewise assume, without deciding, that the retention of an entity to provide utilization review will generally benefit patients in making sure patients receive appropriate care.[6] That said, "the fact that the [third party] will generally obtain a benefit from the contract is not sufficient in itself to authorize the [third party] to sue . . . under California's third party beneficiary doctrine." (*Id.* at p. 835.)

As to the second prong, that a motivating purpose of the contracting parties is to provide a benefit to the third party, the court held that the plaintiff's allegations were insufficient "because providing a benefit to employees is ordinarily not among the motivating purposes of a contract between an employer and a payroll company." (*Goonewardene, supra,* 6 Cal.5th at p. 837.) "Instead, the relevant motivating purpose is to provide a benefit *to the employer,* with regard to the cost and efficiency of the tasks performed and the avoidance of potential penalties." (*Id.* at p. 835.)

---

[6] Given that utilization review includes decisions regarding medical necessity, and potential disapproval of certain procedures a patient may desire, this assumption is open to question—particularly given the vague and conclusory assertions of benefit set forth in the SAC.

Finally, as to the last prong that permitting the third party to bring a breach of contract action against a contracting party is consistent with the contract's objectives and the contracting parties' reasonable expectations, the court found the plaintiff's allegations insufficient. (*Goonewardene, supra*, 6 Cal.5th at p. 837.) "[T]here is no need to permit a third party employee to bring suit to enforce an alleged breach by [the payroll company] of its obligations under the contract, because [the employer] is available and is fully capable of pursuing a breach of contract action against [the payroll company] if, by failing to comply with its contractual responsibilities, [the payroll company] renders [the employer] liable for any violation of the applicable wage orders or labor statutes. Simply put, permitting an employee to sue [the payroll company] for an alleged breach of its contractual obligations to [the employer] is not necessary to effectuate the objectives of the contract." (*Id*. at p. 836.) With respect to the contracting parties' reasonable expectations, the court held that interpreting the alleged contract to allow employees to sue the payroll company "would clearly impose substantial additional costs on the payroll company," which "would likely lead a payroll company to pass these additional litigation costs on to the employer through a higher price for its payroll services, an increased cost that an employer would typically prefer to avoid." (*Ibid*.) Given all these deficiencies, the court found the complaint's allegations were insufficient to state a cause of action for breach of contract by the plaintiff against the payroll company under the third party beneficiary doctrine. (*Id*. at p. 837.)[7]

_____

[7] Compare *Lucas v. Hamm* (1961) 56 Cal.2d 583, in which our Supreme Court held that the intended beneficiaries of a will

14

The trial court here properly sustained the demurrer to the breach of contract claim without leave to amend because Shankar's third party beneficiary allegations are insufficient for the reasons explained in *Goonewardene*. Shankar does not allege the specific terms of the alleged contracts, nor does he attach a copy of them. Instead, he alleges on information and belief that there are contracts (the terms of which he does not know) between Medpoint and L.A. Care, and Medpoint and Pioneer, related to Medpoint's provision of utilization review services. The alleged terms of these contracts are too vague and conclusory to demonstrate (as *Goonewardene* requires at the pleading stage) that the contracting parties expressly or impliedly authorized patients to maintain a breach of contract action against Medpoint.

The SAC's allegations are insufficient to show a motivating purpose of the contracts was to provide a benefit to persons like Shankar, as opposed to providing benefits to the insurer and Shankar's primary physician medical group "with regard to the cost and efficiency of the tasks performed and the avoidance of potential penalties." (*Goonewardene, supra*, 6 Cal.5th at p. 835.)

---

could sue under a contract between the testator and the attorney who prepared the will. (*Id*. at p. 590.) The *Goonewardene* court explained that result, noting that "Because, after the testator's death, the testator was no longer available to bring a breach of contract action against the attorney, it was consistent with the objectives of the contract and the reasonable expectation of the contracting parties to permit the intended beneficiaries of the will to bring such an action at that time to enforce the attorney's alleged breach of the contract." (*Goonewardene, supra*, 6 Cal.5th at p. 832.)

Shankar's allegations are also insufficient "because it would be inconsistent with the objectives of the contract and the reasonable expectations of the contracting parties to permit" patients to sue Medpoint for an alleged breach of its contract with either L.A. Care or Pioneer. (*Goonewardene*, *supra*, 6 Cal.5th at p. 837.) The SAC's allegations do not show that permitting a patient to sue Medpoint for an alleged breach of its contractual obligations to L.A. Care and/or Pioneer is necessary to effectuate the objectives of the purported contracts. (*Id*. at p. 836.) L.A. Care and Pioneer are available (and were themselves sued), and both L.A. Care and Pioneer are fully capable of pursuing a breach of contract action against Medpoint if, by failing to comply with its contractual responsibilities, Medpoint renders L.A. Care or Pioneer liable for any violation of the applicable statutes and regulations.[8] Nor do the allegations show how permitting a third party to sue is consistent with the contracting parties' reasonable expectations. Instead, permitting a patient to sue as a third party beneficiary on the conclusory allegations set forth in the SAC "would clearly impose substantial additional costs" on Medpoint, which would likely lead it and others similarly situated "to pass these additional litigation costs on to [physician groups and insurers] through a higher price for its [utilization review] services, an increased cost that" the contracting parties "would typically prefer to avoid." (*Id*. at p. 836.)

---

[8] We note in this regard that Shankar alleges in this lawsuit and his related one against Pioneer that both L.A. Care and Pioneer had the very duty to arrange for a referral to an infectious disease specialist which he alleges Medpoint is contractually obligated to provide and which forms the basis for his breach of contract claim against Medpoint.

16

In sum, we conclude that Shankar fails to plead a viable breach of contract cause of action. Shankar requests leave to amend but he fails to carry his burden of showing a "reasonable possibility that the defect can be cured by amendment." (*Blank v. Kirwan, supra*, 39 Cal.3d at p. 318.) The only amendment Shankar proposes is to allege "how many contracts were involved," but that does not address the more fundamental defect in his claim which is the lack of factual allegations showing that the motivating purpose of the alleged contracts was to benefit him and other patients and that allowing him and other patients to sue Medpoint is consistent with the reasonable expectations of the contracting parties. Notably, in sustaining Medpoint's demurrer to the breach of contract cause of action as stated in the first amended complaint, the trial court set out the elements of a third party beneficiary claim as articulated in *Goonewardene* and granted Shankar leave to amend his claim. Yet in his SAC Shankar failed to allege any additional facts to satisfy the *Goonewardene* elements. This, combined with Shankar's failure to identify to this court any factual allegations he could add to satisfy the *Goonewardene* elements, leads us to conclude that there is no reasonable possibility Shankar will be able to cure the defect in his breach of contract cause of action and that the trial court did not abuse its discretion in denying Shankar leave to amend.

## D. Shankar Fails to Plead a Viable Cause of Action for Violation of the UCL

The UCL authorizes causes of action, among other things, to redress "unfair competition." (§ 17203.) In turn, section 17200 defines "unfair competition" under the UCL as "any unlawful, unfair or fraudulent business act or practice and unfair,

17

deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Because "section 17200 is in the disjunctive, it prohibits practices that are 'unfair,' 'unlawful' or 'fraudulent.' [Citations.]" (*Countrywide Financial Corp. v. Bundy* (2010) 187 Cal.App.4th 234, 256.)

Shankar alleges that Medpoint violated section 1300.67.2.2(c)(5)(B), which he contends required Medpoint to arrange for him to be examined by an infectious disease specialist within 96 hours, and that this violation was both an "unlawful" business practice and an "unfair" business practice. As is discussed below, we conclude that Shankar fails to allege "unlawful" or "unfair" conduct by Medpoint.

1.  *Shankar Fails to Plead that Medpoint Engaged in "Unlawful" Business Practices*

Shankar contends his allegation that Medpoint violated section 1300.67.2.2(c)(5)(B) supports a cause of action under the UCL for "unlawful" business practices. Medpoint responds, and we agree, that this regulation only applies to an HCSP. As Shankar does not contend Medpoint is an HCSP, the complaint fails to state a claim for unlawful business practices.

As explained above, section 1300.67.2.2(c)(5)(B) applies only to "[a] health care service plan that provides or arranges for the provision of hospital or physician services . . . or provides mental health services pursuant to a contract with a full service plan." (Cal. Code Regs., tit. 28, § 1300.67.2.2, subd. (a)(1).) Health and Safety Code section 1345, subdivision (f) defines a " '[h]ealth care service plan' " (and a " 'specialized health care service plan' ") as either of the following: "Any person who undertakes to arrange for the provision of health care services to

18

subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (*Id.*, subd. (f)(1).)

Shankar does allege that L.A. Care is an HCSP. He does not allege that Medpoint is an HCSP, nor does he allege any facts suggesting that Medpoint receives "a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees," within the meaning of Health and Safety Code section 1345, subdivision (f)(1). In addition, the trial court specifically granted Shankar leave to amend that Medpoint is an HCSP, but Shankar elected not to amend. "Where . . . ' "a plaintiff is given the opportunity to amend his complaint and elects not to do so, strict construction of the complaint is required and it must be presumed that the plaintiff has stated as strong a case as he can." ' [Citation.]" (*Tarkington v. California Unemployment Ins. Appeals Bd.* (2009) 172 Cal.App.4th 1494, 1502.) Based on the foregoing, we conclude that Shankar has failed to allege that Medpoint is an HCSP.

Shankar argues that even if Medpoint is not an HCSP, it can still be deemed to have engaged in "unlawful" business practices under the UCL based on three theories. None of his theories has any merit. The first is that Medpoint "had a contractual obligation to perform its duties so that the entities with whom it had contracted complied with their statutory and regulatory obligations." But even if Medpoint had such a contractual duty, it was not bound by the regulation and thus would not be engaging in "unlawful" conduct by itself failing to act in accordance with a regulation that does not apply to it. Shankar's second theory is that Medpoint " 'aided and abetted'

19

other entities in violating the applicable regulations." Even assuming an entity can be held liable for aiding and abetting a violation of the regulation, Shankar does not allege sufficient facts showing that Medpoint aided and abetted L.A. Care, or any other HCSP, in violating the regulation. Contrary to Shankar's characterization, section 1300.67.2.2(c)(5)(B) does *not* require that appointments be scheduled within 96 hours of the request for an appointment; instead, it requires that an HCSP "ensure that its network has adequate capacity and availability of licensed health care providers to offer enrollees appointments that meet" certain time frames subject to caveats that permit appointments beyond those guidelines. (Cal. Code Regs., tit. 28, § 1300.67.2.2, subds. (c)(5)(B), (G.) Shankar has not and cannot reasonably allege that Medpoint aided and abetted L.A. Care, or any other HCSP, in failing to ensure its network of providers was adequate.

Shankar's third theory is that conduct is "unlawful" under the UCL if it subjects a party to liability under tort law, and thus Medpoint can be found to have acted "unlawfully" if it is found liable for negligence or IIED. This theory fails because conduct that subjects a party to tort liability is not the equivalent of "unlawful" conduct for purposes of the UCL. (See *Klein v. Earth Elements, Inc.* (1997) 59 Cal.App.4th 965, 969 [rejecting argument that claims for strict products liability and breach of implied warranty of fitness can support a claim of "unlawful" conduct under the UCL; "While these doctrines do provide for civil liability upon proof of their elements they do not, by themselves, describe acts or practices that are illegal or otherwise forbidden by law"].)

In summary, Shankar has failed to allege that Medpoint engaged in "unlawful" business practices in violation of the UCL.

2. *Shankar Fails to Plead that Medpoint Engaged in "Unfair" Business Practices*

Shankar's UCL cause of action is considered a "consumer" case. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 187, fn. 12 [distinguishing between "an action by a competitor alleging anticompetitive practices" and "actions by consumers or by competitors alleging other kinds of violations of the unfair competition law"].) "In this court, the test for determining whether a business practice is unfair in consumer cases arising under the UCL is the same as that used under section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(n)). (*Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403 . . . ; *Klein v. Chevron U.S.A., Inc.*[ (2012)] 202 Cal.App.4th [1342,] 1376 & fn. 14.) '[A] business practice is "unfair" if (1) the consumer injury is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by consumers themselves.' (*Klein*, at p. 1376 & fn. 14 [applying and following *Camacho*].)" (*Rubenstein v. The Gap, Inc.* (2017) 14 Cal.App.5th 870, 880.)

We conclude Shankar's allegations are not sufficient to show that Medpoint engaged in "unfair" conduct under the UCL. Shankar alleges that Medpoint's "conduct . . . in violating . . . [section] 1300.67.2.2(c)(5)(B) also constituted unfair business practices" under the UCL. However, as discussed above in connection with Shankar's claim under the "unlawful" prong of the UCL, section 1300.67.2.2(c)(5)(B) does not apply to Medpoint,

21

which is not alleged to be an HCSP.  Shankar's allegation that Medpoint violated section 1300.67.2.2(c)(5)(B)  is a legal contention we do not accept as true.  (*Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318.)  Shankar further alleges "(i) the conduct is a violation of public policy that is explicitly tethered to a specific regulatory provisions [*sic*]; (ii) the conduct offends established public policy and is unethical, oppressive, unscrupulous, and substantially injurious to consumers; and (iii) the injury is substantial, and it is neither outweighed by countervailing benefits nor avoidable by victims of that conduct."  These allegations are legal or factual conclusions that parrot tests adopted by various courts for determining whether conduct is "unfair" under the UCL, including the test adopted by this court in *Rubenstein v. The Gap, Inc.*, *supra*, 14 Cal.App.5th at page 880.  (See *Blank v. Kirwan*, *supra*, at p. 318 [in ruling on a demurrer a court does not accept as true " 'contentions, deductions or conclusions of fact or law' "].)  These allegations do not support Shankar's UCL claim because they do not identify any specific conduct by Medpoint that was allegedly an "unfair" practice under the UCL, and because as explained above Medpoint was not bound by the regulation on which Shankar relies.

Therefore, we conclude that Shankar fails to state a claim under the "unfair" practices prong of the UCL.  The trial court afforded Shankar three opportunities to state a claim for "unfair" practices under the UCL before denying him further leave to amend.  Shankar's appellate briefing does not identify any further allegations he could make that would state a viable claim of "unfair" practices under the UCL.  Therefore, the trial court

22

did not abuse its discretion in granting the demurrer to the UCL "unfair" practices claim without leave to amend.

## E. Shankar Fails to Plead a Viable Class Action with Respect to his Negligence and IIED Causes of Action

We turn finally to the trial court's sustaining of the demurrer to the class action allegations on the negligence and IIED causes of action.[9] "Class actions are statutorily authorized 'when the question is one of common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . .' (Code Civ. Proc., § 382.)" (*Newell v. State Farm General Ins. Co.* (2004) 118 Cal.App.4th 1094, 1100.) "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.]" (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).) " '[T]he "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the

---

[9] In his reply brief, Shankar references a document published by the Department of Managed Health Care which he claims "provides useful and interesting information about business entities such as Med[p]oint." Shankar indicates he is not requesting us to take judicial notice of the document, but suggests we "may wish to do so" on our own motion. We do not take judicial notice of this document, and we will not consider information outside the record which is presented for the first time in the reply brief.

23

class; and (3) class representatives who can adequately represent the class." ' [Citation.]" (*Ibid*.)

1.  *Standard of Review*

The general principles regarding review of an order granting a demurrer apply to review of an order granting a demurrer to class allegations. (*Newell v. State Farm General Ins. Co.*, *supra*, 118 Cal.App.4th at pp. 1099-1100; see *Blakemore v. Superior Court* (2005) 129 Cal.App.4th 36, 54 [review of order granting motion to strike class action allegations is de novo].) Thus, " '[t]he reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.]' " (*Newell*, *supra*, at pp. 1099-1100, quoting *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.)

"When class certification is challenged by demurrer, 'the trial court must determine whether "there is a 'reasonable possibility' plaintiffs can plead a prima facie community of interest among class members . . . ." [Citation.] " 'The ultimate question in every case of this type is whether, given an ascertainable class, the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.]" (*Newell v. State Farm General Ins. Co.*, *supra*, 118 Cal.App.4th at p. 1101, quoting *Silva v. Block* (1996) 49 Cal.App.4th 345, 349-350.) The answer to this question "hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.]" (*Brinker*, *supra*,

53 Cal.4th at p. 1021.) " 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' [Citations.]" (*Id.* at p. 1022.)

Thus, "[t]o assess predominance, a court 'must examine the issues framed by the pleadings and the law applicable to the causes of action alleged.' [Citation.] It must determine whether the elements necessary to establish liability are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence."[10] (*Brinker, supra*, 53 Cal.4th at p. 1024.)

### 2. *Shankar's Cause of Action for Negligence is not Amenable to Resolution on a Class-wide Basis*

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' [Citation.]" (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213.) While the existence of duty is a legal question for the court (*ibid.*), whether a party has breached a legal duty generally depends on the facts present in each case. " '[N]egligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm.' [Citation.] Thus, as a general proposition one 'is required to exercise the care that a person of

---

[10] Shankar argues that "Nowhere in [*Brinker*], nor in any other published opinion, is there any indication that the criteria to be analyzed [to determine whether a case can proceed as a class action] depend upon the particular legal theory or cause of action being advanced against a particular defendant." As shown by the above quotation, *Brinker* stands for this very proposition.

25

ordinary prudence would exercise under the circumstances.' [Citations.] Because application of this principle is inherently situational, the amount of care deemed reasonable in any particular case will vary, while at the same time the standard of conduct itself remains constant, i.e., due care commensurate with the risk posed by the conduct taking into consideration all relevant circumstances. [Citations]." (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 997, fn. omitted; see *Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 546 ["In most cases, courts have fixed no standard of care for tort liability more precise than that of a reasonably prudent person under like circumstances"].)

Assuming for purposes of argument that Medpoint owes a duty of due care to patients with respect to arranging evaluations by medical specialists, whether Medpoint breached that duty is a question of fact that must be decided independently with regard to each patient.[11] The evidence upon which the reasonableness of Medpoint's action will be determined is different for each patient, and will involve the patient's specific medical condition, how

_____

[11] Shankar contends that "[t]he [c]ourt must assume as true the allegations in the SAC pertaining to [Medpoint], namely that it brazenly violates applicable regulations and the standards of the medical profession by delaying and denying referrals to specialty physicians, and that such conduct is causing substantial suffering, severe physical harm, or death to a large number of individuals, likely in the thousands." However, Shankar does not identify any such allegations, and he does not allege that he has any knowledge of Medpoint's handling of referrals for other patients. We cannot reasonably infer from Shankar's allegations regarding Medpoint's handling of his referral that Medpoint has a policy or practice of handling all referrals in the same manner.

26

urgently the patient needed to see a specialist, and the availability of an appropriate medical specialist.[12]

Shankar's proposed class definition encompasses patients "who were unable to obtain specialty medical services in compliance with the specific deadlines imposed by the California Code of Regulations." To the extent Shankar contends that Medpoint can be held liable for negligence whenever it fails to arrange for a specialty consultation within specific time frames, his contention fails. The regulation Shankar relies upon—section 1300.67.2.2(c)(5)—does not apply to Medpoint, which is not alleged to be an HCSP. (Cal. Code Regs., tit. 28, § 1300.67.2.2(a)(1).) Furthermore, while that regulation imposes a duty on an HCSP to "ensure that its network has adequate capacity and availability of licensed health care providers to offer enrollees appointments that meet" certain timeframes (*id.*, § 1300.67.2.2.(c)(5)(C)), it also makes clear those timeframes are not hard and fast rules. The regulation goes on to state that "[t]he applicable waiting time for a particular appointment may be extended if the referring or treating licensed health care provider, or the health professional providing triage or screening services, as applicable, acting within the scope of his or her

---

[12] Depending on the facts specific to each patient, Medpoint could be entitled to raise various issues such as whether a referral was even medically necessary. We disagree with Shankar's argument that "[t]he necessity of medical care is determined by the primary care provider if referral to a specialist is necessary." While the primary care provider's opinion may be relevant if the necessity of specialized care is a disputed issue, Medpoint would be entitled to present contrary evidence and have the fact-finder decide the issue if it is disputed.

27

practice and consistent with professionally recognized standards of practice, has determined and noted in the relevant record that a longer waiting time will not have a detrimental impact on the health of the enrollee" (*id.*, § 1300.67.2.2.(c)(5)(G)), and further that certain types of services and follow up care "may be scheduled in advance consistent with professionally recognized standards of practice as determined by the treating licensed health care provider acting within the scope of his or her practice." (*Id.*, § 1300.67.2.2.(c)(5)(H).) Moreover, a different subdivision sets a less specific requirement that an HCSP "shall provide or arrange for the provision of covered health care services in a timely manner appropriate for the nature of the enrollee's condition consistent with good professional practice." (*Id.*, § 1300.67.2.2(c)(1); see Health and Saf. Code, § 1367.03, subd. (a)(1) [an HCSP "that provides or arranges for the provision of hospital or physician services . . . [¶] . . . shall provide or arrange for the provision of covered health care services in a timely manner appropriate for the nature of the enrollee's condition consistent with good professional practice"].)

In short, even assuming that these regulatory standards could be applied to Medpoint (which is not alleged to be an HCSP) through negligence law, determining whether this standard has been met cannot be accomplished on a class-wide basis. As shown by the above regulations, the time frame in which any patient is seen depends on highly individualized determinations regarding among other things the medical condition(s) at issue, the nature of the referral, the professional judgment of the physicians making the referral as well as those treating the referred patient, and any potential detriment (or lack thereof) in a longer waiting time.

28

In addition, to establish liability each patient must not only show a breach of duty by Medpoint but must also show that the breach caused them a cognizable injury. Such a showing must be made on an individualized, case-by-case basis for each patient, and the nature and amount of damages will vary significantly from patient to patient. Even if there has been an unreasonable delay in scheduling a patient's referral to a medical specialist, it does not necessarily follow that the patient has been injured. For example, it might be that the patient's condition does not cause any pain or discomfort and does not deteriorate. And even if a patient experiences pain or discomfort, or their condition deteriorates, it does not necessarily follow that seeing a specialist sooner would have made the situation better. Finally, if patients were in fact injured, the extent of those injuries will vary significantly from patient to patient based on a host of individualized factors.

In sum, Medpoint's liability to class members under a negligence theory will depend on individualized proof relating to the specific circumstances of each patient. Conversely, Shankar fails to identify any common issues. In his opening brief, he argues that "[t]he key common question is how often [Medpoint] fails to comply with its obligations in a manner that causes injury." This question is stated in extremely vague terms, and the question *how often* Medpoint fails to comply with its obligations is not a common question. In his SAC, Shankar alleges one common question of fact applicable to his tort claims: "whether [Medpoint] routinely disregards the standards of the medical profession as well as California regulations when arranging for specialty medical services for patients." Again, this

statement is extremely vague, and whether Medpoint acts "routinely" is not a common question.

This case is similar to *Brown v. Regents of University of California* (1984) 151 Cal.App.3d 982, where the plaintiffs sought to pursue a class action against the University of California, Davis, Medical Center. The plaintiffs alleged 11 causes of action, including intentional concealment, negligent and intentional misrepresentation, and negligence, arising from coronary care provided by the medical center. (*Id.* at pp. 986-987.) The trial court granted the medical center's demurrer to the class action allegations, and the Court of Appeal affirmed. (*Id.* at p. 991.) The court concluded that the concealment and misrepresentation claims were not amenable to class wide adjudication because, among reasons, "A class member's particular medical condition and method of treatment must be examined in order to determine proximate cause of any claimed damage and the actual extent of such damage." (*Id.* at p. 989.) As to the negligence claim, the court stated, "While the regulations and standards alleged to have been violated are general enough to apply to any patient, the proof of the fact of the actual violations and resulting damages raise substantial individual questions. 'In general, mass tort actions for personal injuries are not appropriate for class-action treatment . . . in that the major elements in tort actions for personal injuries—liability, causation, and damages—may vary widely from claim to claim. Reluctance to extend class-action treatment to mass torts governs even those types of claims which necessarily contain common questions of law and fact.' " (*Id.* at p. 991, quoting *Rose v. Medtronics, Inc.* (1980) 107 Cal.App.3d 150, 155.)

We recognize that the trial court sustained the demurrer to the class action allegations with leave to amend, noting Shankar could potentially seek non-damages relief that might potentially be amenable to class treatment.  Shankar, however, makes no argument for any non-damages relief nor proffers any way in which he could amend the class action allegations to cure the defects noted above.  We accordingly conclude that there is no reasonable possibility Shankar will be able to establish a community of interest among the potential class members with respect to his cause of action for negligence because individual issues predominate over common questions of law and fact.  The demurrer to the class allegations as to the negligence cause of action was therefore properly sustained, and further leave to amend is not appropriate or necessary.

3.     *Shankar's Cause of Action for IIED is not Amenable to Resolution on a Class-wide Basis*

"A cause of action for intentional infliction of emotional distress exists when there is ' " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " ' [Citations.] A defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' [Citation.]  And the defendant's conduct must be ' " 'intended to inflict injury or engaged in with the realization that injury will result.' " ' [Citation.]" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050-1051.)  "Severe emotional distress means ' "emotional distress of such substantial quality or enduring

31

quality that no reasonable [person] in civilized society should be expected to endure it." ' [Citations.]" (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1004.) In *Hughes v. Pair*, the court held that the "plaintiff's assertions that she has suffered discomfort, worry, anxiety, upset stomach, concern, and agitation . . . do not comprise ' " 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.' " ' [Citation.]" (*Hughes, supra*, at p. 1051.)

Thus, in order for a would-be class member to establish that Medpoint is liable to them for IIED, they would have to prove that Medpoint engaged in "extreme and outrageous conduct," that Medpoint intended to cause that class member to suffer emotional distress or acted with reckless disregard of causing the class member emotional distress, that they suffered "severe or extreme emotional distress," and that their emotional distress was proximately caused by Medpoint's conduct. All of these elements require highly individualized proof and, thus, there is no reasonable possibility that Shankar will be able to establish a community of interest among the potential class members. (See *Bennett v. Regents of University of California* (2005) 133 Cal.App.4th 347, 359 [trial court did not abuse its discretion in finding that the difficulty of establishing each class member's claim outweighed the benefit of jointly trying common issues where class members would have had to prove severe emotional distress].)

In conclusion, Shankar's IIED cause of action, like his negligence cause of action, is unsuitable for class-action treatment. There is no reasonable possibility that Shankar can plead a prima facie community of interest among class members

with respect to his causes of action for negligence or IIED because individual issues predominate over common issues for both causes of action. As with the negligence cause of action, Shankar makes no argument for any non-damages relief nor proffers any way in which he could amend the class action allegations to cure the defects noted above. The demurrer to the class allegations as to the IIED cause of action was therefore properly sustained, and further leave to amend is not appropriate or necessary.

## DISPOSITION

We affirm the trial court's order sustaining Medpoint's demurrer to Shankar's causes of action for breach of contract and violation of the UCL without leave to amend, and to the class action allegations related to Shankar's causes of action for negligence and IIED. We reverse the trial court's grant of further leave to amend the class action allegations on the negligence and IIED claims, and deny Shankar further leave to amend those allegations. Medpoint is awarded its costs on appeal.

NOT TO BE PUBLISHED


WEINGART, J.


We concur:



ROTHSCHILD, P. J.



BENDIX, J.